UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-80334-CIV-MARRA/HOPKINS

SEYMOUR ALTMAN, an individual and
MILDRED ALTMAN, an individual,

Plaintiffs,

vs.

LIFESPACE COMMUNITIES, INC., f/n/a
Life Care Retirement Communities, Inc., an
Iowa corporation d/b/a HARBOUR'S EDGE,

Defendant.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant's Amended Motion for Summary

Judgment as to Claims of Violation of § 651.061 Florida Statutes (DE 54)[1] and Plaintiffs'

Motion for Partial Summary Judgment (DE 55).  The motions are fully briefed and ripe for

review.  The Court has carefully considered the motions and is otherwise fully advised in the

premises.

I.  Background

The facts, as culled from exhibits, depositions, answers, answers to interrogatories and

reasonably inferred therefrom for the purpose of these motions, are as follows:

Defendant Lifespace Communities, Inc. f/n/a Life Care Retirement Communities, Inc.

d/b/a Harbour's Edge ("Defendant") is a not for profit corporation with a 501(c)(3) tax exempt

status.  One qualification for this exemption includes allowing residents to remain for life at the

_____

[1] Previously, Defendant filed a motion for summary judgment (DE 53), which is rendered
moot by its filing of an amended motion for summary judgment.

facility even if those residents are unable to pay their bills.  Most of its residents are very wealthy with an average monthly income of $15,000.00 and average assets of $3,265,000.00. (Theresa Bertram Dep. 71-72, DE 58-1; James Biere Dep. 139-40, DE 71-1; Scott Harrison Dep. 28-29, DE 57-5; Defendant's 2009 and 2010 Tax Returns, Ex. I and J to Biere Dep., DE 71-6, 71-7.)

Plaintiffs Seymour and Mildred Altman ("Plaintiffs") are 86 and 82 years of age, respectively.  (S. Altman Dep. 9, DE 66-1; Confidential Data Application, Ex. M to Bertram Dep., DE 67-6.)  In 2005, due to their vision problems and need for medical care, Plaintiffs decided to move into an independent living retirement community where they would feel comfortable and that provided activities, transportation services and medical care. (S. Altman Dep. 22, 24-27; M. Altman Dep. 8-9, DE 57-3; Bertram Dep. 104.)  Plaintiffs liked Defendant's facility because it was on the water, close to friends, had a good physical plan, active programs and a financial waiver if they encountered financial difficulties.  The facility is considered a Leading Life Care Community in South Florida, winner of the Florida Gold Seal, and is located on 19 acres with views of the Intracoastal. (Betty Edwards Dep. 47, 63-67, DE 73-1; S. Altman Dep. 24-32.)

In October of 2005, Plaintiffs provided Defendant with financial information prepared by their accountant.  Defendant's sales and marketing director transferred that information onto Defendant's form with some minor changes, including the higher sales price subsequently obtained by them on their home and the $45,000 value of a life insurance policy. Plaintiffs were approved for the apartment they had selected and made a deposit on November 18, 2005.  (Jason Altman Dep. 1-6, 24-26, DE 75-1; Residency Application, Ex. I to Altman Dep., DE 75-2; S. Altman Dep. 34-41, 48, 86-87, 89-90; S. Altman Dep. II 167-71; DE 57-2; M. Alman Dep. 7, 14-

2

16.)

On February 14, 2006, Plaintiffs signed the "75% Return-of-Capital™ Residency

Contract" ("Contract") and paid the balance of the "Entrance Fee" in the amount of $337,500.00,

a "Sponsorship Fee" in the amount of $15,000.00, a "Working Capital Fee" in the amount

$3,970.00, for total up-front payments of $393,970.00. (Closing Statement, Notice of Filing

("NOF") 7, DE 56-1; Contract, Ex. A to Bertram Dep, DE 67-1; M. Altman Dep. 21.)  The

Contract called for an initial aggregate total minimum monthly charge of $3,970, effective

January 1, 2006, which increased over the years. (Section 2.4, Contract.)

> The Glossary of the Contract defines the following pertinent terms:
>
> "Harbour's Edge" means that facility known as Harbour's Edge, which is the subject of
> the Contract, including the apartments, Harbour's Edge Health Center, and all common
> areas.
>
> "Harbour's Edge Health Center" means the health center forming a part of Harbour's
> Edge, which is intended to provide the nursing care as outlined in the Contract.
>
> "Monthly Charges" means all those monthly charges payable pursuant to the terms of the
> Contract, including the Sustaining Fee, the Service Fee, the fees for optional service, the
> additional monthly fees for nursing care, and all other fees and charges payable monthly
> pursuant to terms of the Contract, as appropriate in the particular circumstances.

(Glossary, Contract.)

> Section 5.1 of the Contract provides, in part, that "[i]f you are temporarily assigned to the
> Harbour's Edge Health Center . . . we will provide nursing care in the Harbour's Edge
> Health Center without extra charge beyond your regular Monthly Charges."

(Section 5.1, Contract.)

> Section 6 of the Contract states:
>
> Duration of Your Right to Occupy the Apartment. You can live in your Apartment for as
> long as you (or either of you) live unless you (or both of you) are not capable of
> independent living or this Contract is terminated by you or by us. If, in the opinion of

3

your attending physician, the Medical Director or LCRC,[2] your physical or mental health requires that nursing care be given, you agree to relocate to the Harbour's Edge Health Center where LCRC is licensed to provide such care.

(Section 6, Contract.)

Section 8.1.2 of the Contract provides:

8.1 Just Cause. LCRC will not terminate this Contract except for just cause. Just cause includes, but is not limited to the following:

8.1.2 Except as set forth below, failure to pay LCRC any charges:

(Section 8.1.2, Contract.)

Sections 8.2, 8.2.1 and 8.2.2 of Contract sets forth the following:

8.2 Financial Difficulties. If, after you have paid the Entrance Fee you encounter financial difficulties making it impossible for you to pay the Monthly Charges and other charges for the Apartment or nursing care in the Harbour's Edge Health Center then:

> 8.2.1 You may remain until the Entrance Fee, plus any applicable Title XVIII Medicare benefits and/or third party insurance benefits received by LCRC on your behalf have been earned.

> 8.2.2 Because it is and shall continue to be the declared policy of LCRC to operate as a nonprofit organization and not to terminate your residency solely by reason of your financial inability to pay the total Monthly Charges, you shall be permitted to remain at Harbour's Edge at reduced Monthly Charges, based on your ability to pay for so long as you establish facts to justify deferral of usual charges, and the deferral of such charges can, in the sole discretion of LCRC, be granted without impairing the operation of Harbour's Edge on a sound financial basis.  The provisions of this Paragraph shall not apply if you have impaired your ability to meet your financial obligations hereunder by intentionally depleting your resources through gifts or other transfers or by not maintaining Medicare Part A, Medicare Part B, and adequate supplemental insurance coverage. To evidence the terms of the deferral of such charges, you agree to enter into a special hardship agreement with LCRC at the time of any such deferrals to reflect the reduced charges currently required. The Entrance Fee refund will be offset against any deferred charges.

(Sections 8.2, 8.2.1 and 8.2.2, Contract.)

---

[2] "LCRC" refers to Defendant.  (Glossary, Contract.)

4

Section 9.5 of the Contract provides:

9.5 Termination After Occupancy. In the event the Resident or LCRC terminates this Contract after occupancy, we will refund a declining portion of your Entrance Fee based on the period of your occupancy at the Community as set forth below:

9.5.1 Your entrance fee refund will be reduced by four percent (4%) upon the date you assume occupancy at the Community, which amount will be retained by us as a processing fee;

9.5.2 Your Entrance Fee refund will be further reduced by the one percent (1%) of your Entrance Fee per full month of occupancy, and a pro rata portion of such one percent (1%) for any partial month of occupancy, until your Entrance Fee refund has been amortized down to $281,250.00 (an amount equal to seventy-five (75%) percent of your Entrance Fee.)

9.5.3 In addition to the portion of the Entrance Fee not reimbursed LCRC will retain a sum equal to:

> 9.5.3.1 The amount of any Monthly Charges deferred by LCRC on behalf of Resident under Paragraph 8.2 hereof; and

> 9.5.3.2 All health care expenses incurred on Resident's behalf and other amounts payable to LCRC, which remains unreimbursed,

> 9.5.3.4[3] The Entrance Fee refund will be paid, without interest, upon the date we receive the next Entrance Fee for your Apartment. In the event your Apartment is reoccupied by an existing resident of the Community who transfers from another apartment, your Entrance Fee will be due and payable upon the date we receive the next Entrance Fee for the apartment vacated by the existing resident who transferred to your Apartment. If more than one internal transfer of existing residents occurs, payment of your Entrance Fee refund will be tied to the last vacated apartment. If LCRC terminates this Contract for just cause as outlined in Section 8, the Entrance Fee refund will be paid, without interest, within forty-five (45) days after you have vacated the Apartment.

> 9.5.5 All amounts not reimbursed to Resident under this Paragraph 9.5 are nonrefundable, and shall be used by the Community solely to fund its reserves, its replacement and improvement needs, and its debt service, which the Community would be responsible to fully fund, and in the event that reserves are fully funded, debt service coverage is achieved and capital

---

[3] There is no provision 9.5.3.3

equipment and improvements are met, the excess funds could be used for operations with approval by LCRC.  The Sponsorship Fee paid pursuant to Paragraph 1.2 is nonrefundable and will be used by LCRC at its discretion for any purpose.

(Section 9.5, Contract.)

In the spring of 2010, Plaintiffs realized their financial resources would soon be depleted.[4]  As such, they approached the Executive Director Theresa Bertram in order to find out how to transition to and use the unearned portion of the Entrance Fee. (M. Altman Dep. 30-32; Bertram Dep. II 189, DE 58-2; Biere Dep. 160; Edwards Dep. 67.)  Ms. Bertram explained to Mr. Altman that before Defendant would consider a hardship request, Plaintiffs must have a guarantor in place, despite the fact that the hardship policy makes no reference to a requirement that a guarantor be in place.[5] (Bertram Dep. 126-28; Bertram Dep. II 184; Biere Dep. 112-14; June 1, 2010 memo from Bertram to Biere, Ex. S to Bertram Dep., DE 68-2; Memo to File, Ex. V to Bertram Dep., DE 68-4; Defendant's Accounting Manual, Ex. F to Bertram Dep., DE 67-2; Financial Policies, Ex. G to Bertram Dep., DE 67-3.)

On May 21, 2010, Ms. Bertram met with Mr. Altman and provided him a letter explaining the requirements for the hardship discount.[6]  Among other things, the letter explained that Plaintiffs' request would not be considered until their assets are $12,000 or less, their

---

[4] During the period from January 2010 through December 2010, Plaintiffs' highest bank balance was $61,484.86 and lowest bank balance was $19,670.13. (Banking Records, Ex. A, DE 54-1.)  Their monthly bills from Defendant ranged from a low of $4,911.60 in July of 2010 and a high of $14,345.68 in December of 2010. (Monthly Bills, Ex. B, DE 54-1.)

[5] Defendant did not possess any records showing that Plaintiffs made any gifts or transfers to children or charities. (Biere Dep. 109.)

[6] Plaintiffs testified that he did not want a hardship deferral. Instead, they wanted to spend down the entrance fee already paid to Defendant. (S. Altman Dep. 179; M. Altman Dep. 30.)

residence would not be terminated solely by reason of financial inability to pay the total monthly

charges, they would need a guarantor for the monthly service fee once the hardship discount

depleted the entrance fee remainder, and recommended that Plaintiffs "significantly pare down

monthly expenses." (May 21, 2010 letter from Bertram to Plaintiffs, Ex. R to Bertram Dep., DE

67-4.)  On June 7, 2010, Ms. Bertram once again informed Plaintiffs that the request for a

hardship discount "would be considered once their assets are $12,000 or less and you have

obtained a guarantor for the monthly service fees and extra charges you may incur once the

hardship discount depletes your entrance fee remainder." (June 7, 2010 letter from Bertram to

Plaintiffs, Ex. T to Bertram Dep., DE 68-3.)  Ms. Bertram also told Plaintiffs that they did not

have to pay the regular monthly service charges beginning in October and only had to pay the

miscellaneous charges, pending the guarantor agreement. (M. Altman Dep. 39; S. Altman II Dep.

195; Bertram Dep. 135-37.)  Plaintiffs' October bill reflects that a $4,911.00 hardship discount

was credited to them. (October bill, NOF 1, DE 56-1.)  Ms. Bertram testified that the October bill

was based on the expectation of receiving the guarantor agreement. (Bertram Dep. 136.)  On

October 28, 2010, however, Ms. Bertram informed Plaintiffs that because Defendant had not yet

received the guarantor form, payment of the monthly service fee was now in arrears. (October 28,

2010 letter from Ms. Bertram to Plaintiffs, Ex. W to Bertram Dep., DE 68-5.)

Plaintiffs then asked either their son or daughter to serve as a guarantor. (June 28, 2010

letter from Ms. Bertram to file, Ex. K to Edwards Dep., DE 73-4; M. Altman Dep. 10, 41.)  On

August 26, 2010, Mr. Geffen, the attorney for Plaintiffs' daughter and son-in-law (the

"Meltzes"),  informed Ms. Bertram that the Meltzes would sign an agreement which provides

that they will guarantee payment of the monthly service fee when the entrance fee refund is

7

exhausted.  Mr. Geffen also informed Ms. Bertram that the Meltzes "want some language added to a guaranty agreement or in a side agreement that would terminate or void the guarantee when [Plaintiffs] leave the facility to live with [the Meltzes] when the funds are exhausted."  (August 26, 2010 email from Mr. Geffen to Ms. Bertram, Ex. A to Geffen Dep., DE 73-6.)

On November 11, 2011, Ms. Betram hand-delivered a letter to Plaintiffs.  The letter explained that Defendant determined Plaintiffs were not eligible for a hardship discount based on their assets and income, and it served to provide "notice of termination" of the Contract. Specifically, the letter stated that Plaintiffs' contract would be terminated if they did not pay the attached past due bill for $10,037.94 within 30 days.[7]  It also stated that Plaintiffs must stay current on their future monthly service fees and charges and have a guarantor responsible for the monthly service fees and charges because of the depletion of their assets. The bill showed a reversal of the hardship discount and a due date of November 12, 2011 for payment of the $10,037.94.  (November 11, 2011 letter and attached bill from Ms. Bertram to Plaintiffs, Ex. Z to Bertram Dep., DE 68-6.)

Ms. Bertram noted that the Meltzes had only agreed to serve as a guarantor once Plaintiffs' funds had been exhausted. (November 14, 2010 email from Ms. Bertram to Mr. Biere, Ex. AB to Bertram Dep., DE 68-8.)  Defendant, however, did not want to wait until Plaintiffs' funds were depleted for the placement of a guarantor, even though Defendant's entitlement to a guarantor was not contained in the contract (Bertram Dep. 144; Biere Dep. 63.)   According to Defendant, Plaintiffs had not paid their monthly service bill for two months (Biere Dep. 57.)

---

[7] Plaintiffs' bank records reflect that had $34,598.09 in their bank account at this time. (November bank statement, Ex. A, DE 54-1.)

Specifically, the September 2010 bill indicated charges of $5,112.20 were due.  The first October 2010 bill showed a payment was made on September 8, 2010 of $5,104.20 and new charges of $5,093.63.  Another bill dated in October of 2010 showed a hardship discount of $4,991.00 subtracted from the bill and an amount of $182.63 due.  The November 2010 bill reversed the hardship discount and asserted unpaid charges of $10,037.94. (Monthly Bills, Ex. B, DE 54-1.)

When Plaintiffs got the November 11, 2011  letter, they contacted their daughter. Plaintiffs' daughter provided Defendant with a signed copy of Defendant's guaranty agreement the next day along with a cover letter explaining, "It is our understanding that our responsibility starts when all of the funds of [Plaintiffs] have been exhausted." Once the funds are exhausted, the Meltzes explained that Plaintiffs will move out (November 12, 2010 letter from the Meltzes to Ms. Bertram, Ex. AA to Bertram Dep., DE 68-7; Bertram Dep. 188-89; M. Altman Dep. 24, 28.)  According to Defendant,  a guarantor arrangement was sought because Plaintiffs were not eligible for a hardship discount. (Bertram Dep. 145-46.)

On November 14, 2010, Ms. Bertram requested that Mr. Biere, Defendant's chief operating officer, consider allowing Plaintiffs' daughter to serve as guarantor once Plaintiffs' funds were exhausted, as opposed to requiring her to be a guarantor immediately. (November 14, 2010 letter from Bertram to Biere, Ex. AB to Bertram Dep., DE 68-8.)  Mr. Biere rejected Ms. Bertram's request and told her to proceed with cancelling the agreement and take what is due out of the entrance fee refund. (November 5, 2010 email from Mr. Biere to Ms. Bertram, Ex. AA to Biere Dep., DE 71-8.)  Mr. Biere explained that the hardship policy does not permit for the entrance fee to be used to pay the monthly service fee.  Instead, the policy requires the entrance fee be kept in reserve. (Biere Dep. 65-77.)

Once Plaintiffs' daughter was rejected as a guarantor, Plaintiffs saw no reason to stay at Harbour's Edge. (M. Altman Dep. 24-26.)  Instead, Plaintiffs went in search of a new apartment and paid a $11,290 deposit at the Carlisle, where they live today. (S. Altman II Dep. 219.) Plaintiffs remained at Harbour's Edge until approximately January 2011. (January 11, 2011 bill, Ex. B, DE 54-2.)   Defendant subsequently refunded Plaintiffs $264,727.29, which included the entrance fee of $375,000.00, less the processing fee and occupancy amortization totaling $93,750.00 less the balance allegedly due of $16,522.71. (January 24, 2011 letter from Cyndi Denig to Plaintiffs, NOF 8, DE 56-1.)

On November 8, 2010, the State of Florida informed Defendant that the upfront sponsorship and working capital fees must be considered part of the entrance fee.[8] (November 8, 2010 letter from State of Florida to Defendant, Ex. C to Biere Dep., DE 71-2.)  Defendant added an addendum to new contracts to reflect this change, and the State informed Defendant that it need not change the contracts of its current residents. (December 17, 2010 email from Becky Griffith to Annette Miller, Ex. F, DE 76-6.)  Plaintiffs were not refunded either the sponsorship or working capital fee. (January 24, 2011 letter from Cyndi Denig to Plaintiffs, NOF 8, DE 56-1.)

Plaintiffs move for partial summary judgment on counts one, two and three of the First Amended Complaint. With respect to count one, Plaintiffs claim that Defendant has violated Chapter 651 of Florida Statutes governing continuing care contracts because it (1) wrongfully terminated Plaintiffs' continuing care contract prior to expiration and without just cause; (2) failed to refund Plaintiffs' working capital fee and sponsorship fee that made up part of the

---

[8] Defendant, as a continuing care facility, is not permitted to use a contract that is not approved by the State. (Biere Dep. 15.)  The contract signed by Plaintiffs was approved by the State. (State's approval stamp, Ex. E, DE 76-5.)

entrance fee and (3) failed to describe adequately in the contract the circumstances under which a resident would be permitted to remain in the facility in the event of financial difficulties.  With respect to count two, Plaintiffs contend that Defendant violated Florida Statutes § 651.083 when it required Plaintiffs to secure a third-party guarantor as a requirement for a continued stay at the facility.  Lastly, with respect to count three, Plaintiffs assert that Defendant breached the contract by terminating it based on Plaintiffs' alleged failure to pay their monthly service fees and by demanding a guarantor.

Defendant moves for partial summary judgment on count one.  Specifically, Defendant contends that Florida Statute § 651.061 was not violated because Plaintiffs were able to pay their monthly charges, but chose not to make the payment.

## II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the

nonmoving party's case.  Id. at 325.

    After the movant has met its burden under Rule 56(a), the burden of production shifts and

the nonmoving party "must do more than simply show that there is some metaphysical doubt as

to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the materials

cited do not establish the absence or presence of a genuine dispute, or that an adverse party

cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

    Essentially, so long as the non-moving party has had an ample opportunity to conduct

discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477

U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may

be granted." Anderson, 477 U.S. 242, 249-50.

    III. Discussion[9]

    A. Count one

    Florida Statute § 651.055 provides in pertinent part:

    Continuing care contracts; right to rescind

    1) Each continuing care contract and each addendum to such contract shall be submitted

_____

    [9] In a diversity case, the Court applies Florida law. See Pendergast v. Sprint Nextel Corp.,
592 F.3d 1119, 1132-33 (11th Cir.2010); Royal Ins. Co. of America v. Whitaker Contracting
Corp., 242 F.3d 1035, 1040 (11th Cir.2001).

to and approved by the office before its use in this state. Thereafter, no other form of contract shall be used by the provider until it has been submitted to and approved by the office. Each contract must :

(d)  Describe the health and financial conditions required for a person to be accepted as a resident and to continue as a resident . . .

(e) Describe the circumstances under which the resident will be permitted to remain in the facility in the event of financial difficulties of the resident. The stated policy may not be less than the terms stated in s. 651.061.

Florida Statutes § 651.055(1)(d) and (e).

Florida Statute § 651.061 provides in pertinent part:

Dismissal or discharge of resident; refund

(1) No contract for care shall permit dismissal or discharge of the resident from the facility providing care before the expiration of the contract, without just cause for such a removal. For any contract entered into on or after October 1, 1997, and terminated by a provider for just cause, the provider shall pay to the resident any refund due upon the resident's vacating the facility, less a reasonable amount to cover the anticipated cost of utilities, telephone, or other obligations, if applicable and as documented by the provider. Any funds retained and not used for such purposes will be refunded to the resident within 45 days of vacating the unit. . . . . The term "just cause" includes, but is not limited to, a good faith determination that a resident is a danger to herself or himself or others while remaining in the facility.

(2) It shall not be deemed just cause if the resident is unable to pay monthly maintenance fees until the entire unearned entrance fee, plus, when applicable, any Medicare benefits under Title XVIII of the Social Security Act and/or third-party insurance benefits received, is earned by the facility. . . .Should these entrance fees be exhausted within 90 days of the date of failure to pay, the facility may not require the resident to leave before 90 days from the date of failure to pay, during which time the resident shall continue to pay the facility a reduced fee based on her or his current income.

Florida Statutes §651.061.

Florida Statute 651.083 provides in pertinent part:

Residents' rights

(1) No resident of any facility shall be deprived of any civil or legal rights, benefits, or privileges guaranteed by law, by the State Constitution, or by the United States Constitution

13

solely by reason of status as a resident of a facility. . .

(6) This section does not supersede any bill of rights provided by law for residents of nursing homes or assisted living facilities.

Florida Statute 651.083 (1) and (6).

According to Plaintiffs, the November 11, 2011 letter informed Plaintiffs that the contract was terminated for failure to pay their monthly service fees and charges,[10] despite the fact that no monies were due and Ms. Bertram instructed them not to pay the October monthly fees.  (DE 55 at 5-6.)  In addition, Plaintiffs contend that Defendant terminated the contract prior to allowing Plaintiffs to earn back the entire entrance fee.  In response, Defendant relies on its own motion for summary judgment by arguing that Plaintiffs had adequate funds to pay the monthly service charges. (DE 54 at 6-8.)

The Court finds that there is a question of fact as to whether Defendant had just cause to terminate the contract it entered into with Plaintiffs. On one hand, there is record evidence that Plaintiffs had $34,598.09 in their bank account on November 11, 2011 when they received the letter informing them that they would be terminated if they did not pay the past due bill for $10,037.94 within 30 days.  A reasonable fact finder therefore could conclude that Plaintiffs were able to pay the monthly service fees. If that conclusion was reached,  it would not be a violation of the statute for Defendant to terminate the contract prior to earning the entrance fee.  On the other hand, there is also record evidence that Ms. Bertram told Plaintiffs that they did not have to pay the regular monthly service charges beginning in October and only had to pay the miscellaneous charges pending the execution of the guaranty agreement.  In addition, a hardship discount was applied to

---

[10] The letter stated both that the contract was terminated and that the contract would be terminated if certain conditions were not met.

14

one of Plaintiffs' October bills.  This creates a question of fact whether it was just cause for Defendant to seek to terminate the contract for failure to pay the monthly bill.  For this reason, summary judgment is denied for Defendant on count one and denied for Plaintiff on count one on this basis.

Next, Plaintiffs claim that Defendant violated Florida Statutes § 651.061(1) when it refunded Plaintiffs' entrance fee, but failed to include in the refund the sponsorship fee and working capital fee.  The question of whether Defendant violated section 651.061(1) turns on the question of whether Defendant rightfully terminated the contract.  Because a question of fact remains on that issue, the Court concludes that there is also a question of fact with respect to any refund to which Plaintiffs might have been entitled. [11]

B. Count two

Chapter 651 of the Florida Statutes governs continuing care contracts.  "'Continuing care' or 'care' means, pursuant to a contract, furnishing shelter and nursing care or personal services to a resident who resides in a facility, whether such nursing care or personal services are provided in the facility or in another setting designated in the contract for continuing care, by an individual not related by consanguinity or affinity to the resident, upon payment of an entrance fee." Florida Statutes § 651.011.  As a condition to operate in Florida, continuing care facilities must offer nursing services.  Florida Statutes § 651.023(8).

Section 651.13 of the Florida Statutes provides that "[a]ny resident injured by a violation of

---

[11] Plaintiffs also argue that summary judgment on count one is required because Defendant violated Florida Statutes § § 651.055(1) and 651.083(1) and (6) when it required a third-party guaranty in violation of 42 U.S.C. § § 1395i(c)(5)(A)(ii), 1395i(c)(5)(A)(ii) and 42 C.F.R. § 483.12(d)(2).   This argument, however, goes to count two of the First Amended Complaint, not count one.  <u>Compare</u> First Am. Compl. ¶ 56(a)-(g) <u>with</u> First Am. Compl. ¶ 70.

this chapter may bring an action for the recovery of damages plus reasonable attorney's fees." Florida Statutes § 651.13. Section 651.083 of the Florida Statutes provides, in pertinent part, that "[n]o resident of any facility shall be deprived of any civil or legal rights, benefits, or privileges guaranteed by law, by the State Constitution, or by the United States Constitution solely by reason of status as a resident of a facility." Florida Statutes § 651.083(1).

Under the federal Nursing Home Reform Act (NHRA), skilled nursing facilities[12] and nursing facilities[13] accepting Medicare and Medicaid assisted residents are governed by the NHRA. See 42 U.S.C. § 1396a(28)(A) (2007); 42 U.S.C. § 1396r(b)-(d). Pursuant to the NHRA, skilled nursing facilities and nursing facilities cannot "require a third party guarantee of payment to [its] facility as a condition of admission (or expedited admission) to, or continued stay in, [its] facility." 42 U.S.C. § 1395i–3(c)(5)(A)(ii); 42 U.S.C. § 1396r(c)(5)(A)(ii); see also 42 C.F.R. § 483.12(d)(2).

_____According to the contract entered into by the parties, "Harbour's Edge" is defined as the "facility known as Harbour's Edge, which is the subject of the Contract, including the apartments, Harbour's Edge Health Center, and all common areas." "Harbour's Edge Health Center" means "the health center forming a part of Harbour's Edge, which is intended to provide the nursing care as

---

[12] A "skilled nursing facility" is defined as an institution which "is primarily engaged in providing to residents skilled nursing care and related services for residents who require medical or nursing care, or rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases. . . ." 42 U.S.C. § 1395i-3(a)(1).

[13] A "nursing facility" is an institution which is "primarily engaged in providing to residents skilled nursing care and related services for residents who require medical and nursing care, rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases. . . ." 42 U.S.C. § 1396r(a).

16

outlined in the Contract." "Monthly charges" are "all those monthly charges payable pursuant to the terms of the Contract, including the Sustaining Fees, the Service Fees, the fees for optional services, the additional monthly fees for nursing care, and other fees and charges payable monthly pursuant to the terms of the Contract, as appropriate in the particular circumstances." (Glossary, Contract.) Section 5.1 of the Contract provides, in part, that "[i]f you are temporarily assigned to the Harbour's Edge Health Center . . . we will provide nursing care in the Harbour's Edge Health Center without extra charge beyond your regular Monthly Charges." (Section 5.1, Contract).

            Taking into account the federal requirements prohibiting the imposition of a third-party guarantee in skilled nursing facilities and nursing facilities, the incorporation of those requirements by Chapter 651 of the Florida Statutes, and the additional requirement in Chapter 651 that continuing care facilities must offer nursing services, the Court finds that Defendant's requirement of a third-party guaranty constitutes a violation under Chapter 651 as a matter of law.[14] The Contract clearly provided that Plaintiffs were contracting with a facility that provided, among other services, the right to nursing care. (Glossary and Section 5.1, Contract.)

            In so ruling, the Court rejects Defendant's reliance on 42 U.S.C. § 1396r(c)(5)(B)(v).[15]  The

---

[14] Given this ruling, it is unnecessary to address Plaintiffs' argument that Defendant violated Florida Statute § 651.055 when it imposed the requirements of a guarantor and an income test without adequately describing  these requirements in the contract.

[15] Treatment of continuing care retirement communities admission contracts

Notwithstanding subclause (II) of subparagraph (A)(i), subject to subsections (c) and (d) of section 1396r-5 of this title, contracts for admission to a State licensed, registered, certified, or equivalent continuing care retirement community or life care community, including services in a nursing facility that is part of such community, may require residents to spend on their care resources declared for the purposes of admission before applying for medical assistance.

Court does not read this provision as creating an exception to the prohibition of a third-party guaranty as a condition of continued stay at a nursing care facility.  Instead, it allows for a qualifying facility to require a resident to spend down their resources before applying for "medical assistance" which, as defined in 42 U.S.C.A. § 1396d, refers to the Medicaid program.  <u>See</u> <u>University of Washington Med. Ctr. v. Sebelius</u>, 674 F. Supp. 2d 1206, 1210-11 (W.D. Wash. 2009) (explaining that 42 U.S.C. § 1396d "specifically defines 'medical assistance' as payment of part of all of the cost of enumerated services" under the Medicaid Act).  Here, the record evidence demonstrates that Plaintiffs sought to continue their stay at Defendant's facility, not to seek medical assistance.  Thus, this statutory provision is inapplicable.[16]

### C.  Count three

The elements of a breach of contract action are (1) a valid contract; (2) material breach and (3) damages from the breach. <u>Friedman v. New York Life Ins. Co.</u>, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008); <u>Rollins, Inc. v. Butland</u>, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006).  Plaintiffs move for summary judgment on this count based on (1) Defendant's termination of Plaintiffs' contract on the grounds that Plaintiffs did not pay their monthly service fees and charges despite having been instructed not pay the October bill; (2) Defendant's termination of  the contract prior to allowing Plaintiffs to earn back the entrance fee and (3) Defendant's demand for a guarantor. (DE 55 at 17.)

---

42 U.S.C. § 1396r(c)(5)(B)(v).

[16] The Court also rejects Defendant's argument that it did not violate the law because it admitted Mrs. Altman to its skilled nursing facility for 20 days in August 2010.  Plaintiffs' claim is not that Defendant violated the law by denying her admission to the skilled nursing facility, but rather Defendant denied Plaintiffs the ability to continue to stay at the facility without a third-party guarantor, therefore placing an impermissible condition upon their continued enjoyment of all the benefits under the Contract.

As discussed in section III(A), factual issues preclude summary judgment for Plaintiffs on the first two bases.  Specifically, the record is not sufficiently developed to determine whether (1) Defendant had just cause to terminate Plaintiffs' contract and (2) it was impossible for Plaintiffs to pay their monthly charges and other charges.  With respect to Defendant's demand for a guarantor, the Court finds that summary judgment on the breach of contact claim is appropriate on this basis.

Accordingly, Plaintiffs' motion for summary judgment on count three is granted in part and denied in part.

<u>IV. Conclusion</u>

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendant's Motion for Summary Judgment (DE 53) is **DENIED AS MOOT**.

2)      Defendant's Amended Motion for Summary Judgment as to Claims of Violation of § 651.061 Florida Statutes (DE 54) is **DENIED**.

3)      Plaintiffs' Motion for Partial Summary Judgment (DE 55) is **GRANTED IN PART AND DENIED IN PART.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of April, 2012.

_____
KENNETH A. MARRA
United States District Judge